**In re Ernest R. LILLEY, Jr., Debtor.**

**Ernest R. LILLEY, Jr., Plaintiff,**

v.

**INTERNAL REVENUE SERVICE, Defendant.**

Bankruptcy No. 92–12373S.
Adv. No. 92–1152S.

United States Bankruptcy Court,
E.D. Pennsylvania.

April 1, 1993.

John R. Crayton, McCarthy & Crayton, Bensalem, PA, for debtor.

Shannon L. Hough, Washington, DC, for IRS.

Stephen Raslavich, Philadelphia, PA (Trustee).

Frederic Baker, Asst. U.S. Trustee, Philadelphia, PA (U.S. Trustee).

OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

*A. INTRODUCTION*

The instant proceeding requires this court to determine whether two United States Tax Court ("the Tax Court") decisions, which the parties stipulated constituted practically the entire record of this proceeding, establish that the Debtor's tax liabilities are nondischargeable under 11 U.S.C. § 523(a)(1)(C). Since the Tax Court expressly found that the Debtor "[w]ith deliberation ... evaded his obligation to pay Federal income taxes ...," we conclude that the INTERNAL REVENUE SERVICE ("the IRS") met its burden of proving, by a preponderance of the evidence, that the Debtor "willfully attempted in any manner to evade or defeat" his tax liabilities at issue. Therefore, we will enter a judgment declaring the taxes in question to be non-dischargeable.

*B. PROCEDURAL HISTORY*

ERNEST R. LILLEY ("the Debtor") filed the underlying voluntary individual Chapter 7 bankruptcy case on April 17, 1992. The Debtor identified the IRS as his only creditor in his Schedules,[1] stating that it had an unsecured, nonpriority claim for personal income taxes due for the years 1974 through 1984, estimated to be $160,-000. The IRS did not file a proof of claim or otherwise participate in this case, and this court issued an Order of Discharge on July 24, 1992.

Nothing of significance transpired in this case until November 4, 1992, when the Debtor filed an "emergency application" to reopen this bankruptcy case and to stay a post-petition IRS levy on his Social Security disability benefits of $862.00 monthly.[2] On November 12, 1992, this court approved a Stipulation between the Debtor and the IRS to reopen the case to determine the dischargeability of the Debtor's tax liabilities. The Stipulation provided that, if the Debtor filed a proceeding to determine dischargeability within fifteen (15) days, the IRS would lift the levy pending a decision of this court on the dischargeability issue. Thus, in this Stipulation, the IRS undid its rather precipitous action of acting in its interests first and asking the court to determine whether this action was appropriate later.

The instant adversary proceeding was then filed by the Debtor on November 16, 1992, seeking a judgment that the Debtor's tax liabilities for the years 1975 through 1984 were dischargeable. The IRS answered, and the matter came before this court for trial on January 7, 1993.[3] After a brief colloquy, the parties agreed to submit the matter on a Stipulation of Facts and Briefs to be submitted by February 5, 1993 (the Debtor), and February 16, 1993 (the IRS).[4] The Stipulation consisted merely of two decisions of the Tax Court regarding the Debtor's civil liability under 26 U.S.C. §§ 6651(a) and 6653(a), *Lilley v. Commissioner,* 58 T.C.M. (CCH) 1517, 1990 WL 16904 (1990) (*"Lilley II"*); and *Lilley v. Commissioner,* 58 T.C.M. (CCH) 623, 1989 WL 129135 (1989) (*"Lilley I"*), and the

---

1. This fact is not surprising when it is noted that the Debtor filed a previous Chapter 7 case. Ironically, that case featured a dischargeability proceeding in which the Debtor attempted unsuccessfully to invoke the doctrine of *res judicata* in his favor. *See In re Lilley,* 8 B.R. 561 (Bankr.E.D.Pa.1981).

2. The Debtor claims that this levy violated 26 U.S.C. § 6334(a)(11)(A), which exempts certain "public assistance" payments, such as supplemental security income payments, from levy. The Debtor's claim of an exemption is a nonbankruptcy issue which we do not address and apparently would lack jurisdiction to decide.

3. In its Answer, the IRS stated that all tax liabilities through tax year 1975 had been paid.

Therefore, only tax years 1976 to 1984 are at issue.

4. In its later Motion to supplement the record, the IRS alleges that this court "denied" its request to submit the matter on cross-motions for summary judgment. The transcript reveals only that, after agreeing to submission on stipulated facts, IRS' counsel asked the court if it "wanted" to have the matter submitted on cross-motions. The court indicated that it preferred receipt of a stipulated record, because it could then enter what would unquestionably be a final decision, but did not preclude the parties' submitting the matter in any other manner.

statement that taxes of over $150,000 were assessed on August 20, 1990, for tax years 1976 through 1984.

With the filing its Brief on February 16, 1993, the IRS also filed a Motion to Supplement the Record ("the Motion"). *See* page 716 n. 3 *supra*. In the Motion, the IRS attempted to add to the record: (1) a Declaration of a revenue officer asserting her discovery of three instances, in 1990 and 1991, where the Debtor had allegedly sought to hinder the IRS by transferring assets to his wife; and (2) a judgment of the Tax Court of July 28, 1983, finding the Debtor guilty of failing to file certain income tax returns. After an expedited hearing on the Motion on February 24, 1993, we granted the Motion as to the criminal judgment and reserved decision as to the other materials. In our accompanying Order, the portion of the Motion reserved is denied as moot. We note that we would consider its admission improper in any event, as any relationship it bears to the matters at issue is outweighed by the unfair prejudice that it attempts to create. *See* Federal Rule of Evidence 403. Therefore, we have not considered this material at all in rendering our decision.

The Debtor filed an unsolicited Supplemental Memorandum on March 22, 1993, addressing only the issue of the propriety of our receiving the material reserved in the Motion. Although this submission was harmless, it was nevertheless improper. *See In re Jungkurth*, 74 B.R. 323, 325–26 (Bankr.E.D.Pa.1987), *aff'd sub nom. Jungkurth v. Eastern Financial Services, Inc.*, 87 B.R. 333 (E.D.Pa.1988).

In light of this procedural history, the parties have deferred to *Lilley I* and *Lilley II* in formulating the factual basis of the record. We conclude that the decisive legal issue, although not addressed directly on these terms by the parties in their Briefs, is the extent to which the legal conclusions in those decisions have *res judicata* or collateral estoppel effect upon the outcome of the instant proceeding. It is therefore important to review those decisions at some length in describing our decision-making process. *See In re Bergman*, 103 B.R. 660, 663–66 (Bankr.E.D.Pa.1989)

(district court decision held to have significant collateral estoppel effect is quoted at length in Opinion).

## C. *FACTUAL HISTORY PER THE TAX COURT DECISIONS INCORPORATED INTO THIS RECORD BY REFERENCE*

The Debtor is a graduate of Yale University who also received advanced degrees in psychology from Columbia University and in New Testament theology from Union Theological Seminary. *Lilley I*, 58 T.C.M. at 624. He worked in the minting industry as President of American Mint Associates and as Assistant to the President and Director of Advertising of the Franklin Mint. *Id.* In 1970, he invested his life's savings in Mintmaster, Inc. ("Mintmaster"), a Subchapter S corporation of which he was the sole shareholder. *Id.* Mintmaster minted and sold gold, silver, and bronze medallions and jewelry. *Id.*

In January, 1971, the United States Secret Service seized all of Mintmaster's assets on the belief that the corporation's inventory violated counterfeiting laws and gold regulations. *Id.* In July, 1971, the Debtor's assets were returned, after a determination was made that federal law had not been violated after all by Mintmaster's activities. *Id.* After the seizure, however, the business deteriorated, and the Debtor eventually went out of business in 1973. *Id.*

After the seizure and business failure of Mintmaster, the Debtor believed that he was owed compensation from the Government for the destruction of his business, despite legal advice that federal law barred civil actions against the Government. *Id.* As a result of these beliefs, the Debtor felt that he was unable to file tax returns which honestly reported his income until he had met with federal officials to settle the amount of his claim against the Government. *Id.*

In February, 1974, the Debtor wrote a letter to Senator Hugh Scott, stating that he believed that he had broken income tax filing laws and seeking help in obtaining a settlement conference with the Govern-

ment. *Id.* The Treasury Department responded to his letter, stating that compensation was unavailable for the Debtor's claim for damages, but that the Debtor should contact the District Director of the IRS to discuss his income tax problems. *Id.* The Debtor knew that he had an obligation to file returns, but he failed to do so, even though his attorney at the time repeatedly urged him to do so. *Id.*

In 1974, the Debtor began work as a night watchman for Piquet Security Systems, Inc. ("Piquet"), from which position he was subsequently promoted to Director of Security at Springfield Mall, Delaware County, Pennsylvania. *Id.* In 1977, the Debtor began working in-house as Director of Security for the Springfield Associates, the partnership that owned the Mall. *Id.* In 1978, the Debtor also became Public Relations and Marketing Manager at the Mall. *Id.* In December, 1978, the Debtor also organized his own business, Abacus Programs, Inc., which, until 1980, displayed tourist information in shopping malls. *Id.*

In May, 1974, the Debtor filed a Form W-4 with Piquet, claiming three exemptions from federal income tax withholding. *Id.* The Debtor than filed a Form W-4E with Piquet to prevent federal income tax withholding from his salary. *Id.* On the Form W-4E, the Debtor certified under penalty of perjury that he did not anticipate incurring liability for federal income tax in 1974. *Id.* When the Debtor began work for Springfield Associates in 1977, he filed a Form W-4 indicating "married with one exemption," but again went to the local Internal Revenue Service office to obtain a Form W-4E. *Id.* at 624–25. In 1979, the Debtor again claimed he was exempt from federal withholding on a Form W-4 filed with Springfield Associates. *Id.* at 625.

As a result of filing these W-4 and W-4E Forms, the Debtor did not have any federal tax withheld from his income from 1974 through 1984, with the exception of nominal amounts in 1974, 1977, and 1984. *Id.* However, the Debtor did permit his employers to withhold both Commonwealth of Pennsylvania income tax and Federal Insurance Contribution Act ("FICA") tax

from his wages. *Id.* When filing his W-4 Forms, the Debtor explained to his employers that he did not owe federal income tax because deductions for damages from the federal Government's intervention in his minting business exceeded his income. *Id.*

The Debtor cooperated with the revenue officers who conducted a subsequent civil audit of Mintmaster, and with the special agents who conducted the criminal investigation of his failure to file individual returns. *Id.* He explained to the revenue agents in 1974 and again to the special agents in 1981 that he was upset at the Government for putting him out of business, and that he was unable to file honest returns until he resolved the issue of compensation for the seizure of his business assets with the Government. *Id.* The Debtor asked the agents to help straighten out his personal tax situation. *Id.*

As a result of a subsequent criminal investigation of his circumstances, the Debtor was charged with, and later convicted by a jury of, willful failure to file federal income tax returns for 1976 through 1979 pursuant to 26 U.S.C. § 7203. *Id.* The Debtor's conviction was ultimately affirmed by the Third Circuit Court of Appeals, after which the Debtor served a one-year prison sentence. *Id.* After being released from prison in 1984, the Debtor was required to file his delinquent federal income tax returns for tax years 1974 through 1984 as a condition of his probation. *Id.*

Thomas F. Martin, Esquire ("Martin"), a tax specialist, represented the Debtor from January, 1981 to 1985. *Id.* In 1981, Martin advised the Debtor that it was against his best interest to file his 1980 through 1984 federal income tax returns while the criminal tax investigation was in progress. *Id.* Martin also suggested that the Debtor present a defense of mental illness at his criminal trial in 1983, but the Debtor "rejected the defense." *Id.* When helping the Debtor prepare his 1974 through 1984 tax returns, Martin advised the Debtor that his proposed deductions for "antitrust violations" arising out of the Government's sei-

zure of Mintmaster would be disallowed. *Id.*

The Debtor delayed filing the delinquent returns after his conviction until faced with violation of his probation in 1985. *Id.* He finally filed the delinquent returns on September 9, 1985. *Id.* On his returns, he took deductions as compensation for claims against the Government, labelling them "deductions for antitrust violations," despite Martin's advice that such deductions would be disallowed. *Id.*

The IRS predictably disallowed the deductions and sent the Debtor a Notice of Deficiency. At the ensuing trial of *Lilley I,* the Debtor conceded that the deductions and attributable carryover losses were improper. *Id.* However, at the trial, Dr. Perry A. Berman, a psychiatrist, and Dr. Gerald Cooke, a psychologist, presented reports indicating that they had both determined that the Debtor suffered from a mental illness that originated with the seizure of Mintmaster's assets in 1971. *Id.* at 625–26. These doctors agreed that this mental illness paralyzed him only in federal income tax matters and caused him to believe that he was being persecuted by the federal Government. *Id.* Consequently, the Debtor argued that he was unable to act as a reasonable person, or with willful neglect, negligently, or with intentional disregard of the rules and regulations in connection with the filing of his federal income tax returns for 1974 through 1984. *Id.* at 627–28.

The Tax Court found the Debtor liable under both 26 U.S.C. §§ 6651(a) and 6653(a) for tax years 1974 through 1984. *Id.* at 624. Initially, it found that the Debtor's failure to raise his mental illness as a defense in his criminal trial collaterally estopped him from raising that issue as to the tax years at issue in the criminal case, *i.e.,* 1976 through 1979. *Id.* at 626–27. It also rejected a defense that the Debtor reasonably relied upon Martin's advice in failing to file tax returns in tax years 1981 through 1984. *Id.* at 628–29.

However, the aspects of *Lilley I* which are of most importance here are those relating to the court's finding of the Debtor's willful failure to file tax returns and negligence in so doing as to tax years 1974, 1975, and 1980 through 1984. While stating that this was not dismissing the doctors' testimony, the Tax Court was simply not convinced that a person who generally functioned as well in society as the Debtor did could be suffering from an illness which made it impossible for him to file proper federal tax returns. The core of the decision, for our purposes, is the following passage:

> *We believe that petitioner understood his obligation to file returns and deliberately chose not to do so.* At trial and at numerous times during the tax years in issue, petitioner admitted that he had an obligation to file returns. His awareness of his obligation to file returns is also revealed by his persistent requests to respondent's agents to help with filing returns on which he could claim damages for seizure of his business.
>
> Petition was fully aware of the Government's refusal to compensate him for the destruction of Mintmaster, and he knew that he had no legal recourse against the Government for his claims. Petitioner paid no Federal taxes on claims that would otherwise not be compensated. *With deliberation petitioner evaded his obligation to pay Federal income taxes, not as a result of "paralysis," but by falsely claiming to be exempt from Federal income tax withholding.* Yet petitioner was able to fulfill his obligation to have state and FICA taxes withheld. Additionally, petitioner insisted on taking deductions for "antitrust violations" on his late returns despite specific legal advice that the deductions would be disallowed.
>
> *We find that petitioner acted with willful neglect, not reasonable cause, and acted negligently and with intentional disregard of the rules and regulations* so as to warrant imposition of the additions to tax under both sections 6651(a)(1) and 6653(a) for the years 1974 through 1984. We believe that petitioner's bitterness and resentful behavior caused his repeated failure to file over the 10–year period. *Petitioner's failure*

*to file was, therefore, due to willful neglect, not a mental illness.*

58 T.C.M. at 658 (emphasis added).

A motion for reconsideration of the main three aspects of the *Lilley I* decision was rejected by the Tax Court in *Lilley II*. The Tax Court refused to reconsider its decision that the Debtor was collaterally estopped from denying the applicability of the additions to tax for the years 1976 through 1979 due to mental illness, and that the Debtor reasonably relied on Martin's advice. 58 T.C.M. at 1529, 1520. In further support of his claim of mental illness as to the years not in issue in his prior conviction, the Debtor submitted the affidavit of his treating psychiatrist, Dr. Eugene G. d'Aquili, who agreed with Drs. Berson and Cooke that the Debtor's failure to file proper tax returns was based on his belief that he was entitled to reparation from the Government. *Id.* at 1519. Nevertheless, the Tax Court concluded, at *id:*

> We do not believe that this evidence establishes that petitioner's failure to file was attributable to any condition other than his sense of grievance against the government.

## D. DISCUSSION

### 1. THE IRS BEARS THE BURDEN OF PROVING THE ELEMENTS OF 11 U.S.C. § 523(a)(1)(C).

■ A debtor may generally discharge a federal income tax liability for a tax year for which a return is due·more than three years prior to the date of the filing of a Chapter 7 bankruptcy case. 11 U.S.C. §§ 523(a)(1)(A), 507(a)(7)(A). One exception to this general rule is when a return for a tax year in issue is not filed within two years of the filing of the bankruptcy case. 11 U.S.C. § 523(a)(1)(B). The Debtor admittedly meets all of these criteria as to the tax years in issue, because all of his returns for the disputed tax years, which long precede his bankruptcy case, were filed as of 1985, albeit under pressure of further incarceration, as this case was not commenced until 1992.

The only applicable provision pursuant to which the Debtor's instant tax liabilities could possibly be deemed nondischargeable is 11 U.S.C. § 523(a)(1)(C), which reads as follows:

### § 523. Exceptions to discharge

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

(1) for a tax or a customs duty—

   .     .     .     .     .

(C) with respect to which the debtor made a fraudulent return or willfully attempted in any manner to evade or defeat such tax; ...

Although it appears that the IRS bears the burden in certain proof of claim litigation, *see In re Compass Marine Corp.*, 146 B.R. 138, 144–47 (Bankr.E.D.Pa.1992) (the IRS bears the burden of proving the accuracy of a tax assessment if the debtor submits evidence that an assessment is excessive), there is no doubt that the IRS bears the burden of proving the elements of a submission of a fraudulent return or a willful attempt to evade or defeat taxes in a § 523(a)(1)(C) proceeding. *See In re Graham*, 973 F.2d 1089, 1098–1103 (3rd Cir. 1992). *Graham* makes clear that the preponderance of evidence standard, as set forth in *Grogan v. Garner*, 498 U.S. 279, 289–90, 111 S.Ct. 654, 661, 112 L.Ed.2d 755 (1991), must be satisfied by the IRS in § 523(a)(1)(C) cases. *Id.*

■ In analyzing whether the IRS has met its burden here, we note that § 523(a)(1)(C) includes an important disjunctive. The IRS must prove that the Debtor *either* made a fraudulent return *or* willfully attempted in any manner to evade tax payments. *See In re Hopkins*, 133 B.R. 102, 105–06 (Bankr.N.D.Ohio 1991); and *In re Gilder*, 122 B.R. 593, 595 (Bankr. M.D.Fla.1990). The two disjunctive circumstances referenced in § 523(a)(1)(C) are not the same unless a court is willing to equate the elements of a "willful attempt" at evasion with "fraud." We know of no court which has done so. Any attempt to read the element of intentional deception normally associated with fraud as a necessary element of the term "willful" is countered

by the language in § 523(a)(1)(C) stating that "any manner" of willful attempt to evade taxes is within the scope of the second alternative ground of § 523(a)(1)(C).[5] Hence, if the IRS meets its burden of proving the elements of but one of these two prongs, it will succeed in a § 523(a)(1)(C) proceeding.

## 2. DECISIONS OF THE TAX COURT HAVE COLLATERAL ESTOPPEL EFFECT IN § 523(a)(1)(C) CASES.

■ Although the IRS has not phrased its argument in terms of *res judicata* (claim preclusion) or collateral estoppel (issue preclusion), it is apparent, from its initial agreement to limit the record to the *Lilley I* and *Lilley II* decisions, that it believes that application of at least one of these doctrines supports a decision in its favor. In *Graham*, the court addressed these issues at length, and concluded that the bankruptcy court correctly concluded that application of neither of those doctrines justified a decision in favor of the IRS in that case. 973 F.2d at 1093–98. The court concluded, first, that tax court decisions would not generally have *res judicata* (or claim preclusion) effect in § 523(a)(1)(C) dischargeability cases. *Id.* at 1093–96.

It also held that collateral estoppel, or issue preclusion, did not apply in that case, although that doctrine did apply to § 523(a)(1)(C) litigation generally. *Id.* at 1098–98. The reason that the *Graham* court did not apply collateral estoppel to render a decision in favor of the IRS in that case was attributable to its conclusion that the bankruptcy court was correct in deciding that neither the debtors' stipulation of facts before the Tax Court, nor the Tax Court's findings based on that stipulation, constituted a "finding of fact pertaining to fraud." *Id.* at 1098.

## 3. THE APPLICATION OF COLLATERAL ESTOPPEL IN THE INSTANT CASE REQUIRES A DECISION IN FAVOR OF THE IRS AS TO THE DEBTOR'S WILLFUL ATTEMPT TO EVADE TAXES.

■ In contrast to the Tax Court decisions at issue in *Graham*, we find that the prior Tax Court decisions in the record of this case, while equally as inconclusive as the *Graham* record on the issue of fraud, are very specific in concluding that the Debtor made willful attempts to evade tax liability. The Tax Court expressly found that the Debtor "evaded his obligation to pay Federal income taxes," *Lilley I, supra,* 58 T.C.M. at 628, and did so "[w]ith deliberation." We cannot perceive of any principled way to conclude that the phrase "with deliberation" is distinct from a finding that the Debtor "willfully attempted in any manner" to evade his tax liability.

The portion of the *Graham* opinion on claim preclusion indicating that this court must make its own assessment, independent form the Tax Court's decision, as to whether the Tax Court's finding, in the context of a tax decision, is preclusive in the context of this bankruptcy court's determination of dischargeability.[6] In so doing, we must examine the elements of collateral estoppel, *i.e.,* whether

"(1) the issue sought to be precluded [is] the same as that involved in the prior action; (2) that issue [was] actually litigated; (3) it [was] determined by a final and valid judgment; and (4) the determination [was] essential to the prior judgment...."

*In re Braen,* 900 F.2d 621, 628–29 n. 5 (3d Cir.1990) (quoting *In re Ross,* 602 F.2d 604, 608 (3d Cir.1979) (quoting *Haize v. Hanover Ins. Co.,* 536 F.2d 576, 579 (3d Cir.1976))), *cert. denied,* 498 U.S.

---

5. *See also* pages 722–723 *infra,* where we conclude that the first prong is directed solely at "tax cheats," while noting that the second prong is also directed at "tax protestors."

6. For that reason, as the Debtor properly concedes, the failure of the IRS to seek and obtain a determination against the Debtor under 26

U.S.C. § 6653(b) (penalty added for *fraud* of taxpayer) is not conclusive in his favor. *See Brown v. Felsen,* 442 U.S. 127, 138–39, 99 S.Ct. 2205, 2213, 60 L.Ed.2d 767 (1979); *Levinson v. United States,* 969 F.2d 260 (7th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 505, 121 L.Ed.2d 441 (1992); and *In re Fernandez,* 112 B.R. 888, 889–90 (Bankr.N.D.Ohio 1990).

1066, 111 S.Ct. 782, 112 L.Ed.2d 845 (1991).

*Graham, supra,* 973 F.2d at 1097.

Clearly, the second and third of these four criteria for application of collateral estoppel are met here. Further, we find that the Debtor's state of mind in attempting to claim deductions for his losses from Mintmaster on his subsequent tax forms is an issue which is common to both the Tax Court decision and this decision. Therefore, this was an issue involved in the prior Tax Court action, and its determination was essential to the Tax Court's judgment. Consequently, collateral estoppel effect must be accorded to *Lilley I* and *Lilley II* in making our decision.

The conclusivity of the Tax Court decisions becomes apparent when the Debtor's arguments, as articulated in his Brief, are analyzed. The Debtor asks us to conclude that, from a subjective point of view, he was acting properly from a moral point of view, or at least justifiably, in his "misguided" attempts to claim decisions for his damages to Mintmaster.

The Debtor is a very well-educated and obviously intelligent individual. The attempted deductions and the reasons for them are, frankly, bizarre and the illogic of the Debtor's reasoning in his explanation of his actions would be apparent to a child. We could join the Debtor in concluding that the Debtor's motivations are not characterized by stealth or calculated efforts to simply reduce the Debtor's taxes, as is often the case with debtors involved in § 523(a)(1)(C) litigation. We could even join the Debtor in his reasoning that such bizarre claims by a highly-educated individual could be indicative of mental illness. However, we can also perceive another motivation for the Debtor's actions: pure stubbornness and a willingness to flaunt the law simply to make the point of the Debtor's belief that he was treated unfairly. The Tax Court decisions both reject the Debtor's claims of mental illness. There can be little doubt that collateral estoppel

bars any such claims. We believe that, in effect, the Tax Court decisions support the theory that the Debtor, like a tax protestor, but with a more specialized focus, simply refused to comply with known laws because of unadulterated obstreperousness. Such actions, for such reasons, support the conclusion that the Debtor "willfully attempted in any manner to evade" his 1976 through 1984 tax liability.

## 4. THE ARGUMENTS RAISED BY THE DEBTOR CANNOT BE ACCEPTED BY THE COURT.

Although they do not focus on the *res judicata* and collateral estoppel issues, the parties' Briefs address numerous issues, some of which deserve at least our brief attention. However, we believe that the doctrine of collateral estoppel was not in issue in the cases cited in the parties' Briefs. Hence, these cases are of little pertinence to us, since we must decide this case solely on the basis of what was established in the prior *Lilley I* and *Lilley II* decisions.

The Debtor argues that his conduct was not characterized by certain of the "badges of fraud" in tax cases identified by Judge Fox in *In re Graham,* 108 B.R. 498, 503–04 (Bankr.E.D.Pa.1989), *aff'd,* 131 B.R. 275 (E.D.Pa.1991), *rev'd & remanded,* 973 F.2d 1089 (3rd Cir.1992), *i.e.,* concealment, failure to cooperate with authorities, and failure to keep records. *Accord, In re Berzon,* 145 B.R. 247, 250 (Bankr.N.D.Ill.1992). We agree that certain of these elements are absent.[7] The Debtor's stance is much more akin to that of a tax protestor than that of a common tax cheat. However, we have already noted, *see* page 720 *supra,* that § 523(a)(1)(C) has two prongs and is equipped to handle both types of delinquent taxpayers. The first prong (making a fraudulent return) is clearly directed at cheats. The second prong (willful attempt to evade taxes), while also applicable to tax cheats, is clearly applicable to tax protestors as well. The Debtor's Brief fails to

---

7. However, we note that certain "badges" of fraud *are* present, such as the Debtor's extreme reluctance to file returns, and there are very large overpayments of deductions over time. *See Graham, supra,* 108 B.R. at 503–04.

acknowledge the presence of this second prong in his post-trial submissions.

Despite this apparent unawareness of the separate existence of the second prong of § 523(a)(1)(C), the Debtor nevertheless relies heavily on *In re Toti,* 141 B.R. 126 (Bankr.E.D.Mich.1992) (*"Toti I "*), *rev'd sub nom. United States v. Toti,* 149 B.R. 829 (E.D.Mich.1993) (*"Toti II "*), a case which discusses primarily the second prong of § 523(a)(1)(C). *Toti I* held that the standards to be applied in § 523(a)(1)(C) litigation are those established in cases interpreting a federal statute prohibiting criminal evasion of taxes, 26 U.S.C. § 7201. 141 B.R. at 129–30. In *Toti I,* the court ultimately held that the debtor's willful *omission* of failing to file a tax return out of fear of inability to pay and fear of conviction for failing to file previous returns was not within the scope of § 7201, which dealt solely with willful *commission* of acts to evade taxes. *Id.* at 131.

It is doubtful whether the reasoning of *Toti I* could be applied to the Debtor's circumstances. The Debtor's tax liability arises from the *commission* of the act of taking meritless deductions on his tax returns.

However, as the IRS notes, *Toti I* was reversed in *Toti II. Toti II* held that the *Toti I* court erred in applying the criminal standards of § 7201 and should instead have applied the less rigorous civil definition of "willfully attempt to evade" payment of taxes appearing in, *e.g.,* 26 U.S.C. § 6672. 149 B.R. at 832–34. *Accord, Sells v. United States,* 1991 WL 328039 (D.Colo. 1991); *Gilder, supra,* 122 B.R. at 595 (relies on standards of 26 U.S.C. 6653(b)); *In re Jones,* 116 B.R. 810, 814–15 (Bankr. D.Kan.1990); and *In re Kirk,* 98 B.R. 51, 54–55 (Bankr.M.D.Fla.1989) (relies on standards of 26 U.S.C. § 6653(b)). *See also In re Gathwright,* 102 B.R. 211, 213 (Bankr.

D.Ore.1989) (relies on standards of § 6653(b) and § 7201). The *Toti II* court found that the debtor's acts of omission resulting in his failure to pay were "voluntary, conscious and intentional" and within the scope of the "willful evasion" prong of § 523(a)(1)(C).

At the outset of his Brief, the Debtor analogizes his dispute of over twenty (20) years with the federal Government to the *Jarndyce v. Jarndyce* litigation at issue in C. DICKENS, BLEAK HOUSE (1853). We agree that certain aspects of this dispute are Dickensonian, but we believe that the Debtor's refusal to abandon his belief that it is appropriate for him to deduct his Mintmaster losses from his federal income tax liabilities, even in the face of incarceration and numerous other instances of profound personal embarrassment, has caused the instant dispute to persist so long beyond its normal lifespan. We believe that § 523(a)(1)(C) is properly directed towards obstinate behavior in refusing to pay taxes, such as that exhibited by the Debtor, no matter how principled that obstinateness may be.[8]

## E. CONCLUSION

For all of the reasons stated herein, we are compelled to enter a judgment in favor of the IRS, declaring that the Debtor's tax debts in question are nondischargeable on the basis of 11 U.S.C. § 523(a)(1)(C).

## ORDER

AND NOW, this 1st day of April, 1993, upon consideration of the Stipulation of Facts which the parties agreed could constitute the record of this proceeding; the criminal judgment added to the record pursuant to our Order of February 24, 1993; and the Briefs submitted by the parties, it is hereby ORDERED AND DECREED as follows:

---

8. The IRS also argues that the Debtor's obligation to it is nondischargeable under 11 U.S.C. § 523(a)(7), on the ground that its claims consist, in part, of a penalty for not properly filing his tax returns. We do not accept this reasoning because the Debtor's liability is, for the most part, compensation to the Government for the taxes that he failed to pay. *See In re Stelweck,*

86 B.R. 833, 851–53 (Bankr.E.D.Pa.1988), *aff'd sub nom. Stelweck v. United States,* 108 B.R. 488 (E.D.Pa.1989). Unlike the debtor in *Fernandez, supra,* 112 B.R. at 892, a case relied upon by the IRS on this point, the Debtor's liability did not arise from an assessment of criminal restitution, but rather arose from a determination of civil liability.

1. Judgment is entered in favor of the Defendant, the INTERNAL REVENUE SERVICE ("the IRS"), and against the Plaintiff–Debtor, ERNEST R. LILLEY, JR. ("the Debtor").

2. The Debtor's liabilities to the IRS for the tax years 1976 through 1984 are declared NONDISCHARGEABLE.

3. That aspect of the IRS' post-briefing Motion to Supplement the Record on which this court reserved decision is DENIED as moot.